## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**UTILITY CONSTRUCTORS, INC.**                            **CIVIL ACTION**
**ET AL.**

**VERSUS**                                                          **No. 15-4675**

**LYNN PERKINS PEREZ ET AL.**                          **SECTION I**

## ORDER AND REASONS

This litigation sprouted from dirt. On one side of the lawsuit are Lynn Perkins Perez, Stella Lands, Inc., and Edmond Fitzmaurice III, in his capacity as Trustee of the CKCC Trust (collectively "the Perez entities"). On the other side are Utility Constructors, Inc. ("UCI"), CEL Operations, LLC ("CEL"), Stella Plantation Excavators, LLC ("SPE"), Christopher Lovelace ("Chris"), and Terry Lovelace ("Terry") (collectively "the contractors").[1]

The Perez entities own Stella Plantation, a large piece of property located on the east bank of the Mississippi River in Plaquemines Parish. In the wake of Hurricane Katrina, the federal government and the Louisiana parish governments undertook construction projects in order to improve the levees in and around the areas affected by the hurricane. These improvements required millions of tons of suitable dirt. The Perez property consists of more than 1500 acres and purportedly was in a prime position to meet that demand. Accordingly, the Perez entities began

---

[1] Chris joined the various motions and oppositions filed by UCI, CEL, SPE, and Terry. R. Doc. Nos. 90, 99.

discussions with construction contractors regarding the excavation and sale of dirt from the Perez property.

In the second half of 2011, the Perez entities began negotiating with Chris Lovelace and Terry Lovelace.  The Perez entities claim that Chris, Terry, and UCI—the company Chris and Terry own and/or control—were prepared to enter into an agreement with the Perez entities, but that Chris and Terry did not want the agreement to become public knowledge.  In order to keep the agreement private, the Perez entities state that Terry and Chris proposed the creation of a new entity, SPE (titled after the name of the Perez property), to enter the agreement on Chris, Terry, and UCI's behalf.[2]  According to the Perez entities, the Perez entities agreed to contract with SPE as long as UCI would act as a surety for SPE's obligations under the contract.  The Perez entities assert that Chris and Terry understood that the Perez entities would not enter into an agreement with SPE without a surety agreement.

The Perez entities allege that by December 8, 2011, the parties had arrived at an understanding regarding the principal obligations that would govern their business relationship.  On that day, both parties admit that Chris and Terry, both in their individual capacities and on behalf of UCI, CEL, and SPE, signed a document titled "Supplemental Terms and Conditions" ("Supplemental Agreement").  The Perez entities claim that they also signed the Supplemental Agreement, although the original version which contained their signatures was apparently lost in a subsequent

---

[2] SPE is owned by CEL which is owned and/or controlled by Chris and Terry.

hurricane.  The copy that has been provided to the Court is signed only by Chris, Terry, UCI, and SPE.[3]

The Supplemental Agreement states that the Perez entities and SPE "entered into a Site Development Agreement (the 'Agreement') on this the  8th  day of December, 2011."[4]  It then provides:

> The Perez family, SPE, Christopher Lovelace, Terry Lovelace and Utility Constructors now wish to supplement the terms of the Agreement with certain additional terms and conditions.  All capitalized terms used in this supplement shall have the same meaning as provided in the Agreement.[5]

The Supplemental Agreement proceeds to create a suretyship obligation whereby UCI was to guarantee any liability that SPE might incur under the Site Development Agreement.  In addition, the Supplemental Agreement also contained exclusivity and liquidated damages provisions.  The Perez entities contend that, pursuant to those provisions, the contractors agreed not to supply any projects in Plaquemines Parish with dirt from a source other than Stella Plantation, and that the Perez entities agreed not to allow any other contractor to obtain dirt from Stella Plantation.  If the contractors violated the exclusivity provision, the Supplemental Agreement provided that they would be liable to the Perez entities for liquidated damages in the amount of $1,000,000 plus certain other amounts.[6]

---

[3] According to the Perez entities, SPE had yet to be officially registered as a legal entity at the time.

[4] R. Doc. No. 75-6, at 1.  The " 8th  " was filled in by hand.

[5] R. Doc. No. 75-6, at 1.

[6] R. Doc. No. 75-6, at 2.

Everyone agrees that a Site Development Agreement was not executed on December 8, 2011. While a draft of that Agreement was in existence on December 8, 2011,[7] and although the parties agree that at the time the Supplemental Agreement was signed they all anticipated executing the Agreement later the same day, the Agreement was not finalized and signed until January 10, 2012. The execution of the Agreement was delayed in order that the parties could continue negotiating on two issues: (1) certain aspects of an escrow account that SPE would establish pursuant to the Agreement, and (2) modification of the Agreement in order to optimize tax consequences.

The only parties to the final Agreement were the Perez entities and SPE. When the Agreement was finally signed on January 10, 2012, a new Supplemental Agreement was not executed. The final Agreement nowhere refers to a Supplemental Agreement.

The specific provisions of the primary Agreement and of a later modification to the Agreement added on June 1, 2012 are not relevant to the present motions. Only the validity of the Supplemental Agreement is implicated in the three motions for partial summary judgment. Suffice it to say that before a dispute arose, the parties performed—at least in part—under the primary Agreement for a period of approximately three years. At that point, the dispute arose which gave rise to the present litigation.

---

[7] Indeed, Terry actually initialed the draft on December 8, 2011. The Perez entities argue that this evidences his intent to enter into the Supplemental Agreement.

## MOTIONS FOR PARTIAL SUMMARY JUDGMENT

### I.   Standard of Law

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). When assessing whether a dispute as to any material fact exists, the Court considers "all of the evidence in the record but refrain[s] from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398-99 (5th Cir. 2008). All reasonable inferences are drawn in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment." *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985); *see also Little*, 37 F.3d at 1075. "No genuine dispute of fact exists if the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *EEOC v. Simbaki, Ltd.*, 767 F.3d 475, 481 (5th Cir. 2014).

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial." *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264-65 (5th Cir. 1991). The nonmoving party can then defeat the motion by either countering with evidence sufficient to demonstrate the existence of a genuine dispute of material fact, or "showing that the

moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." *Id*. at 1265.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See id*. at 324. The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue for trial. *See, e.g., id.*; *Little*, 37 F.3d at 1075 ("Rule 56 mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." (quoting *Celotex*, 477 U.S. at 322)).

## II.   The Suretyship Provision

Both sides move for summary judgment with respect to the validity of the suretyship provision contained within the Supplemental Agreement. The Perez entities argue that it is valid. The contractors argue that it is not.

As the parties arguing to enforce the contract, the Perez entities have the burden of demonstrating its validity. La. Civ. Code art. 1831; *see also Price Farms, Inc. v. McCurdy*, 42 So. 3d 1099, 1104 (La. App. 2 Cir. 2010). While the interpretation of a contract's provisions is typically a matter of law, *Rousset v. Smith*, 176 So. 3d

6

632, 637 (La. App. 4 Cir. 2015), the existence or validity of a contract is a finding of fact. *Mark A. Gravel Properties, LLC v. Eddie's BBQ, LLC*, 139 So. 3d 653, 658 (La. App. 3 Cir. 2014). Because it is a fact question, this Court can grant summary judgment as to the validity of the suretyship provision only if the record taken as a whole could not lead a rational trier of fact to adopt the view urged by the contractors. *See Simbaki, Ltd.*, 767 F.3d at 481. Because the Court finds that no genuine dispute of material fact exists with respect to the validity of the suretyship provision, the Court agrees with the Perez entities that it is enforceable.

Under Louisiana law,[8] a contract is defined as "an agreement by two or more parties whereby obligations are created, modified, or extinguished." La. Civ. Code art. 1906. "A contract is formed by the consent of the parties established through offer and acceptance." La. Civ. Code art. 1927. "A contract is null when the requirements for its formation have not been met." La. Civ. Code art. 2029. The four elements of a valid contract are: (1) the parties must possess the capacity to contract; (2) the parties' mutual consent must be freely given; (3) there must be a certain object for the contract; and (4) the contract must have a lawful purpose. *See Worley v. Chandler*, 7 So. 3d 38, 41-42 (La. App. 2 Cir. 2009). "Unless the law prescribes a certain formality for the intended contract, offer and acceptance may be made orally, in writing, or by action or inaction that under the circumstances is clearly indicative of consent." La. Civ. Code art. 1927.

---

[8] Both parties agree that Louisiana law governs this dispute.

Louisiana law specifies that suretyship is "an accessory contract by which a person binds himself to a creditor to fulfill the obligation of another upon the failure of the latter to do so." *Express Blower, Inc. v. Earthcare, LLC*, 410 F. App'x 742, 745 (5th Cir. 2010) (citing La. Civ. Code art. 3035). A suretyship "may be established for any lawful obligation, which, with respect to the suretyship, is the principal obligation." La. Civ. Code art. 3036. "The principal obligation may be subject to a term or condition, may be presently existing, *or may arise in the future*." *Id.* (emphasis added). Indeed, the suretyship "has historically been given for future obligations in Louisiana." *Sizeler Prop. Inv'rs, Inc. v. Gordon Jewelry Corp.*, 550 So. 2d 237, 244 (La. Ct. App. 1989). A suretyship must be express and in writing. *Id.* (citing La. Civ. Code art. 3038). Apart from the requirement that it be in writing, however, "the surety's contract need not observe technical formalities but must contain an absolute expression of intent to be bound." *Ball Mktg. Enter. v. Rainbow Tomato Co.*, 340 So. 2d 700, 701 (La. Ct. App. 1976).

Turning to the contract at issue, the Court first observes that none of the formalities of contract formation invalidate the Supplemental Agreement. It was both in writing and it was signed by the parties.[9] Moreover, as previously explained,

---

[9] Technically, the Perez entities need not have signed the surety agreement in order for it to be effective. Under Louisiana law, "[s]uretyship is established upon receipt by the creditor of the writing evidencing the surety's obligation [and] [t]he creditor's acceptance is presumed and no notice of acceptance is required." La. Civ. Code art. 3039. In any event, however, the Court accepts as true the Perez entities' representation that they signed the suretyship agreement. This is because the contractors have not submitted any competent summary judgment evidence to contradict the Perez entities' sworn representation that they signed the Supplemental Agreement. *See* R. Doc. No. 75-14, at 156-157 (sworn deposition

8

under Louisiana law a suretyship agreement may exist to guarantee an obligation that will arise in the future.  *Sizeler Prop. Inv'rs, Inc.*, 550 So. 2d at 244.  The fact that the Supplemental Agreement was executed prior to the January 10, 2012 primary Agreement does not invalidate it.  Accordingly, the question is simply whether, at the time of contracting, the parties intended the suretyship obligation to be enforceable even if the primary Agreement was signed after December 8, 2011.  The plain language of the Agreement indicates that they did.

The beginning of the Supplemental Agreement states that "[the Perez entities] and [SPE] entered into a Site Development Agreement (the 'Agreement') on this the __8th__ day of December, 2011."[10]  As stated, the word "8th" was filled in by hand.  While the "Agreement" is referenced repeatedly thereafter, the date the Agreement was signed is not mentioned again.  Moreover, nowhere does the Supplemental Agreement contain a contingency provision addressing what would occur if the primary Agreement was not executed on December 8, 2011.  The absence of such a provision is telling.  Taken in context and viewing the contract as a whole, the above provisions make clear that the inclusion of the date was not intended to have any effect on the validity of the Supplemental Agreement itself.  It was instead merely descriptive language, to be filled out on the date the Site Development Agreement was actually consummated.

---

testimony of Chalyn Perez that the Perez entities signed the Supplemental Agreement on December 8, 2011, but that such copy was destroyed by Hurricane Isaac).

[10] R. Doc. No. 75-6, at 1.

The contractors assert that the parties only intended the Supplemental Agreement to be effective if the draft Site Development Agreement was executed on December 8, 2011, and that if the primary Agreement was executed on any other day the parties (or at least the contractors) did not intend the Supplemental Agreement to be binding. But that position is no more than the product of creative lawyering, and it is untenable for several reasons.

For one, as explained above, the plain language of the contract does not support the contractors' view that the date was of any significance. For another, the contractors have offered no plausible explanation as to why the date that the primary Agreement was executed would have been of any importance to the parties. Moreover, they have not contradicted the Perez entities' sworn assertion that the Perez entities made clear that they would not enter into the primary Agreement without the surety provision. Chris and Terry themselves testified at their depositions that they intended to be bound when they signed the Supplemental Agreement on December 8, 2011.[11] Although the primary Agreement entered into on January 10, 2012 was different from the draft Agreement in existence on December 8, 2011, the contractors have not shown that the difference materially affected the nature of the suretyship obligation.

Even if the January 10, 2012 Agreement was materially different, however, the Supplemental Agreement states: "Utility Constructors waives all suretyship

---

[11] R. Doc. No. 74-9, at 145 (deposition of Chris); R. Doc. No. 74-10, at 127-132 (deposition of Terry).

defenses [and] agrees that its guaranty shall remain and continue in full force and effect *as to any modification in or extension of the Agreement*, whether or not Utility Constructors shall have received any notice of or consent to such modification or extension."[12]   It is therefore difficult for the contractors to credibly argue that the version of the primary Agreement that was in existence on December 8, 2011 was the only version that UCI was willing to guarantee.

Under Louisiana law, "[e]ach provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole." La. Civ. Code art. 2050.  In short, the contract as a whole does not evidence that the date the Site Development Agreement was signed was of any material significance to the effectiveness of the Supplemental Agreement.  The Court concludes that no reasonable jury could find that the suretyship agreement is unenforceable simply because the primary Agreement was signed several weeks after originally planned.  The Court therefore holds that the suretyship agreement is enforceable and it grants partial summary judgment in favor of the Perez entities.

## III.   The Exclusivity Provision and the Liquidated Damages Provision

The Perez entities also move for summary judgment on the basis that the exclusivity provision and the liquidated damages provision are enforceable and that Chris, Terry, UPI, CEL, and SPE violated the exclusivity provision and are therefore liable for liquidated damages.  Although the Court concludes that the requirements for contract formation were met as to both the exclusivity provision and the liquidated

---

[12] R. Doc. No. 75-6, at 1 (emphasis added).

damages provision, genuine issues of material fact preclude the Court from deciding whether the liquidated damages provision is contrary to public policy and whether the contractors violated the exclusivity provision.

Parties to a contract may stipulate damages to be recovered in case of a breach of contract.[13]  *1100 S. Jefferson Davis Parkway, LLC v. Williams*, 165 So. 3d 1211, 1218-19 (La. App. 4 Cir. 2015) (citing La. Civ. Code art. 2005).  A stipulated damages clause fixes the amount of damages that may be recovered to ease the burden of proving loss with certainty.  *Id.*  "The stipulated amount replaces the need for damages to be determined by the court."  *James Const. Grp., L.L.C. v. State ex rel. Dep't of Transp. & Dev.*, 977 So. 2d 989, 998 (La. App. 1 Cir. 2007).  There is a presumption that a stipulated damages clause agreed to by the parties is reasonable. *Id.*

Courts may modify stipulated damages if they are "so manifestly unreasonable as to be contrary to public policy."  *Id.*; La. Civ. Code art. 2012.  "That is so because, in spite of their contractual freedom, parties may not avail themselves of a stipulated damages clause as a subterfuge to allow either one or both of them the recovery of damages that are punitive rather than compensatory."  6 La. Civ. L. Treatise, Law Of Obligations § 13.17 (2d ed.) (citing *Mason v. Coen*, 449 So.2d 1195 (La. App. 2d Cir. 1984)).  To determine the reasonableness of the stipulated damages provision,

---

[13] "Stipulated damages" and "liquidated damages" are synonymous under Louisiana law.  *See Bodin v. Butler*, 338 F. App'x 448, 451 (5th Cir. 2009) (explaining that the exact words "stipulated damages" or "liquidated damages" are not important; what matters is that "[t]he substance of the clause is clear and unequivocal in its purpose to set a fixed amount of damages for breach of the agreement").

"the court should inquire as to whether the parties attempted to approximate the actual damages in confecting the agreement." *Keiser v. Catholic Diocese of Shreveport, Inc.*, 880 So. 2d 230, 236 (La. App. 2 Cir. 2004). A stipulated damages provision may be enforceable even if no actual damages are proved. La. Civ. Code art. 2009. What matters is that the stipulated damages were a reasonable approximation of the foreseeable damages that a failure to perform by one party would cause to the other party. 6 La. Civ. L. Treatise, Law Of Obligations § 13.18 (2d ed.). The party arguing that the liquidated damages provision is unenforceable as contrary to public policy bears the burden of defeating it. *James Const. Grp., L.L.C.*, 977 So. 2d at 998.

The Court observes, however, that the "[n]ullity of the stipulated damages clause does not render the principal obligation null." La. Civ. Code art. 2006. Thus even if the stipulated damages clause is found to be penal and unenforceable, the aggrieved party may still recover its actual damages. *Am. Leasing Co. of Monroe v. Lannon E. Miller & Son, Gen. Contracting, Inc.*, 469 So. 2d 325, 329 (La. Ct. App. 1985).

The deposition testimony of Chalyn Perez suggests that the amount of the $1,000,000 liquidated damage provision was selected as a deterrent to prevent the contractors from violating the exclusivity provision.[14] While selecting a liquidated damages amount that a party believes will act as a deterrent is permissible, parties may never use a liquidated damages provision "as a vehicle to recover punitive, as

---

[14] R. Doc. No. 92-1, at 1-2.

opposed to compensatory, damages." *Mason v. Coen*, 449 So. 2d 1195, 1199 (La. Ct. App. 1984). It is uncertain at this stage of the proceedings whether the liquidated damages provision is adequately tied to the amount of compensatory damages that the Perez entities reasonably anticipated sustaining in the event of a breach, or whether it was simply a penalty. The Court therefore denies the motion to enforce the provision at this time.

Similarly, genuine issues of material fact preclude the Court from deciding whether the contractors violated the exclusivity provision. While it is undisputed that the contractors twice used dirt from other properties during the duration of the Agreement, the contractors dispute whether they violated the contract by doing so. The contractors claim that they were forced to look elsewhere for dirt only after the dirt from Stella Plantation was found unsuitable for levee construction. In other words, they claim prior breach by the Perez entities. This is a question that will need to be resolved by the jury. The motion for summary judgment as to this issue is therefore denied.

There remains one procedural issue worth briefly addressing. Whether a stipulated damages provision is unenforceable as contrary to public policy is a question of law for the Court. However, in determining reasonableness, the Court must rely on findings of fact. Consequently, in order to proceed most efficiently, the Court concludes that in addition to determining whether the contractors violated the exclusivity provision, the jury should also determine: (1) the damages that the Perez entities actually incurred as the result of the contractors' violation of the exclusivity

provision, if the contractors did in fact violate the provision; and (2) the foreseeable damages that the contractors' violation of the exclusivity provision would cause to the Perez entities.  6 La. Civ. L. Treatise, Law Of Obligations § 13.18 (2d ed.).[15]  The Court will review the reasonableness of the jury's verdict upon an appropriate post-trial motion and, based on that finding, the Court will decide the enforceability of the stipulated damages provision.  *See Cashman Equip. Corp. v. Rozel Operating Co.*, No. 08-363, 2013 WL 3759709, at *4 (M.D. La. July 15, 2013) (following this procedure to determine the reasonableness of a stipulated damages provision under maritime law).  If the contractors violated the exclusivity provision but the stipulated damages provision is unenforceable as contrary to public policy, the Perez entities may still recover the actual damages that the jury finds they incurred as the result of the contractors' breach of the exclusivity provision.

## MOTIONS IN LIMINE

The two motions in limine currently before the Court are *Daubert* motions to exclude expert testimony filed by the Perez entities.  *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).  While a third motion[16] in limine to exclude evidence of certain benefits allegedly received by the Perez entities has also been filed, the Court will consider that motion at a later date.

---

[15] There may be other factual questions that should be submitted to the jury in connection with this issue.  However, that can be determined with counsel prior to trial.

[16] R. Doc. No. 67.

I.     **Standard of Law**

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert

witness testimony.  *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 588

(1993); *United States v. Hitt*, 473 F.3d 146, 148 (5th Cir. 2006).  Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience,
> training, or education may testify in the form of an opinion or otherwise
> if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will
> help the trier of fact to understand the evidence or to determine a fact
> in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the
> facts of the case.

"To qualify as an expert, 'the witness must have such knowledge or experience in [his]

field or calling as to make it appear that his opinion or inference will probably aid the

trier in his search for truth.'"  *United States v. Hicks*, 389 F.3d 514, 524 (5th Cir.

2004) (quoting *United States v. Bourgeois*, 950 F.2d 980, 987 (5th Cir. 1992)).

Additionally, Rule 702 states that an expert may be qualified based on

"knowledge, skill, experience, training, or education."  *Hicks*, 389 F.3d at 524; *see also*

*Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999) (discussing witnesses

whose expertise is based purely on experience).  "A district court should refuse to

allow an expert witness to testify if it finds that the witness is not qualified to testify

in a particular field or on a given subject."  *Huss v. Gayden*, 571 F.3d 442, 452 (5th

Cir. 2009) (quoting *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999)).  However,

"Rule 702 does not mandate that an expert be highly qualified in order to testify about a given issue.  Differences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility."  *Id.*; *see Daubert*, 509 U.S. at 596.

The U.S. Supreme Court's decision in *Daubert* "provides the analytical framework for determining whether expert testimony is admissible under Rule 702." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 243 (5th Cir. 2002).  Both scientific and nonscientific expert testimony is subject to the *Daubert* framework, which requires trial courts to make a preliminary assessment to "determine whether the expert testimony is both reliable and relevant."  *Burleson v. Tex. Dep't of Criminal Justice*, 393 F.3d 577, 584 (5th Cir. 2004); *see Kumho Tire*, 526 U.S. at 147.

A number of nonexclusive factors may be relevant to the reliability inquiry, including: (1) whether the technique has been tested, (2) whether the technique has been subjected to peer review and publication, (3) the potential error rate, (4) the existence and maintenance of standards controlling the technique's operation, and (5) whether the technique is generally accepted in the relevant scientific community. *Burleson*, 393 F.3d at 584.  The reliability inquiry must remain flexible, however, as "not every *Daubert* factor will be applicable in every situation; and a court has discretion to consider other factors it deems relevant."  *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004); *see Runnels v. Tex. Children's Hosp. Select Plan*, 167 F. App'x 377, 381 (5th Cir. 2006) ("[A] trial judge has 'considerable leeway' in determining 'how to test an expert's reliability.'").  "Both the determination of

reliability itself and the factors taken into account are left to the discretion of the district court consistent with its gatekeeping function under [Rule] 702." *Munoz v. Orr*, 200 F.3d 291, 301 (5th Cir. 2000).

## II.    Opinions of Chris Lovelace and Terry Lovelace

The Perez entities move to exclude certain anticipated opinions by Chris and Terry.  Specifically, they move to prevent both Chris and Terry from testifying that the soil conditions actually encountered on the Perez property were consistent with David Coleman's report of February 3, 2012,[17] and that certain portions of the soil were not suitable for levee construction.  The Perez entities also move to prevent Chris from testifying as to the area of surface clearing completed, the length of levees constructed on the Perez property, and the reasonable cost to plant trees and grassing, construct the pier, and stock the lake on the Perez property.

The Perez entities challenge the proposed testimony on the grounds that neither Chris nor Terry are qualified as experts, that even if they are qualified as experts they have not provided sufficient reasoning or methodology to support their opinions as required by Rule 702, and that neither Chris nor Terry has adequately disclosed his proposed expert opinion in compliance with Rule 26 of the Federal Rules of Civil Procedure.  To the extent Chris and Terry intend to offer these opinions as

---

[17] Mr. Coleman is a geotechnical engineer who was retained by the contractors at the start of the contractual period.  He performed laboratory tests on samples of dirt taken at various depths from the Perez property, and in a February 3, 2012 report he concluded that the top five feet of dirt was suitable for levee construction, that the dirt below five feet was unsuitable by itself for levee construction, and that by mixing the dirt taken from between the surface down to eleven feet, the dirt obtained up to that depth could be used for levee construction.  R. Doc. No. 76-4, at 7.

lay witnesses, the Perez entities argue that the opinions would constitute impermissible lay witness testimony. Even if the Court concludes otherwise, however, the Perez entities contend that the opinions regarding surface area and reasonable costs are based at least in part on estimates obtained from third parties, and that it would be improper for Chris to relate such hearsay to the jury. For the following reasons, the Court agrees that Chris and Terry may not offer any opinions as experts, although some of the proposed testimony is nevertheless admissible.

The chief problem with the proposed expert testimony is its lack of reliability. Even if the Court was to conclude that Chris and Terry are experts in dirt excavation and levee construction, the contractors still have not provided the reasoning or methodology by which Chris and Terry reached their opinions and, therefore, they have failed to convince the Court that the opinions are sufficiently reliable to be admissible. As previously explained, determining whether an expert's testimony is reliable requires "an assessment of whether the reasoning or methodology underlying the testimony is scientifically valid." *Curtis v. M & S Petroleum, Inc.*, 174 F.3d 661, 668 (5th Cir. 1999). The contractors have the burden of making this showing. *See Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998).

In response to the *Daubert* motion, the contractors respond that Chris and Terry's testimony about the suitability of the dirt will be based on their personal observation of the dirt at various depths framed by their thirty years' of experience.[18] The Court recognizes that an expert's testimony need not always be based on

_____

[18] R. Doc. No. 98, at 3; R. Doc. No. 94, at 2.

scientific testing; it can be based on personal experience. *See Kumho Tire*, 119 S. Ct. at 1175–76. However, an expert's self-proclaimed accuracy is never sufficient. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."); *Moore*, 151 F.3d at 276. Though the party offering the challenged expert opinions need not prove "that the expert's testimony is correct," *Moore*, 151 F.3d at 276, he must prove that it is reliable. By summarily asserting that Chris and Terry's opinions are reliable because they have experience, the contractors have essentially advanced a "trust us" or "take our word for it" justification for the reliability of the opinions. That explanation does not allow the Court to meaningfully evaluate the trustworthiness of the opinions, and accordingly the Court will not admit such opinions as expert testimony under Rule 702.[19] But that conclusion does not end the inquiry.

---

[19] Because the contractors have not met their burden under Rule 702 and *Daubert*, the Court need not address whether the contractors failed to adequately disclose Chris and Terry's opinions pursuant to Rule 26. In brief, however, it appears that Chris and Terry may not have been required to provide the Perez entities with the detailed expert report required by Rule 26(a)(2)(B). As non-retained witnesses whose opinions arise from their ground-level involvement in the events giving rise to the litigation, Chris and Terry may only have been required to disclose the subject matter on which they expected to testify and a summary of the facts and opinions to which they expected to testify pursuant to Rule 26(a)(2)(C). *See LaShip, LLC v. Hayward Baker, Inc.*, 296 F.R.D. 475, 480 (E.D. La. 2013) (citations omitted) ("A 26(a)(2)(C) witness's opinion must be based on facts or data obtained or observed in the course of the sequence of events giving rise to the litigation."). Frequent examples of witnesses who fall within Rule 26(a)(2)(C)'s disclosure requirements are treating physicians or other health care professionals and employees of a party who do not regularly provide expert testimony. Fed. R. Civ. P. 26 Advisory Committee's Note to 2010 Amendment. The disclosures required of such witnesses are "considerably less extensive than the report required by Rule 26(a)(2)(B)." *Id.* Thus Chris and Terry's

Lay witnesses can sometimes offer opinions pursuant to Rule 701. *See* Fed. R. Evid. 701. And even if the opinions are not admissible as substantive evidence under Rule 701, the testimony might nonetheless be admitted for the limited purpose of explaining the fact witness's actions in the case. Because Chris and Terry argue that at least some of their proposed testimony should be admitted pursuant to Rule 701,[20] the Court addresses that issue first.

Rule 701 states:

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Fed. R. Evid. 701. The Advisory Committee Notes to the 2000 Amendments explain that "[l]ay testimony results from a process of reasoning familiar in everyday life, while expert testimony results from a process of reasoning which can be mastered only by specialists in the field." Accordingly, "a lay opinion must be based on personal perception, must be one that a normal person would form from those perceptions, and must be helpful to the jury." *United States v. El-Mezain*, 664 F.3d 467, 511 (5th Cir. 2011), *as revised* (Dec. 27, 2011). "A lay witness may not give an opinion that requires 'scientific, technical, or other specialized knowledge within the scope of Rule 702.'" *Id.* (quoting Fed. R. Evid. 701). In *United States v. Riddle*, for example, the Fifth

---

disclosures may have been adequate. Even if they were not, however, the Perez entities have not been unfairly prejudiced. The Perez entities deposed both Chris and Terry, and have never requested a continuance on these grounds.

[20] R. Doc. No. 94, at 3; R. Doc. No. 98, at 3.

Circuit held that it was improper for a lay witness banker to offer his opinion on "prudent" banking practices and to "draw on his specialized knowledge as a bank examiner" in giving his opinions about the defendant's actions.  103 F.3d 423, 428-29 (5th Cir. 1997).  In the same case, however, the Fifth Circuit observed that it has "allowed lay witnesses to express opinions that required specialized knowledge" where "[n]o great leap of logic or expertise" is necessary in order to render the opinion. *Id.*

First, only an expert would be able to testify that the soil conditions on the Perez property were consistent with the conditions reported by Mr. Coleman.  That conclusion is obvious given that Mr. Coleman himself is proffered by the contractors as an expert[21] and that Mr. Coleman was only able to render his opinions after performing tests in a laboratory.  Chris and Terry may not offer their lay witness opinion that the soil conditions were consistent with Mr. Coleman's results.  Moreover, as the contractors have not identified a purpose for admitting the proposed testimony other than substantiating Mr. Coleman's views, the opinion is excluded in its entirety.

Second, the average lay person could not opine whether dirt would be suitable for levee construction.  Indeed, Chris and Terry themselves argue they can only render this opinion due to their purported experience and specialized knowledge in the field.[22]  It follows that, like the banker in *Riddle*, Chris and Terry normally would

---

[21] R. Doc. No. 114.
[22] R. Doc. No. 94, at 3; R. Doc. No. 98, at 3.

not be permitted to opine on these issues at trial without first being qualified as experts. However, without such testimony it would be difficult to understand Chris and Terry's course of conduct in this case. After all, that opinion was purportedly the motivating factor behind Chris and Terry's decision to obtain dirt from other properties despite the exclusivity provision. Accordingly, Chris and Terry may testify that they thought the Perez dirt was unsuitable for the limited purpose of explaining their conduct—the opinion will not be admitted as substantive evidence that the dirt was unsuitable. An appropriate limiting instruction may be provided upon the request of the parties.

Third, assuming that the representations in the contractors' memorandum are true, Chris may testify as a lay witness with respect to the amount of surface area cleared on the Perez property and the length of the additional levees built by the contractors. As Chris explains in his opposition, he first estimated the number of acres the contractors cleared by scaling the maps which were attached to the primary Agreement using a ruler and the known distance between two points contained on the maps.[23] Chris "confirmed the distances by the use of a measuring application on a portable device[, an "iPhone Application" or "iPhone App" called AGRIplot]."[24] With regard to the levees, Chris claims that he physically measured the length of the levees using a tape measure.[25]

---

[23] R. Doc. No. 98, at 3.
[24] R. Doc. No. 98, at 3.
[25] R. Doc. No. 98, at 3.

As a general matter, lay witness estimates of length and surface area are permissible when based on personal observation by the witness.  Prototypical examples of the type of evidence admissible under Rule 701 include testimony "relating to the appearance of persons or things, identity, the manner of conduct, competency of a person, degrees of light or darkness, sound, *size*, weight, *distance*, and an endless number of items that cannot be described factually in words apart from inferences."  Fed. R. Evid. 701 Advisory Committee's Note to 2000 Amendment (citation omitted) (emphasis added).

If Chris had estimated the length of the levees and the amount of surface area cleared based only on his personal observations of the Perez property, there is little doubt that those estimates would be admissible.  Because Chris took certain further steps to improve the accuracy of his estimates, however, the Perez entities claim that the estimates should be wholesale excluded.  The Court disagrees.  In the Court's view, there is a distinction between Chris's measurements using the tape measure and ruler and his measurements using the iPhone App.

Because measuring with a tape measure and scaling a map using a ruler are widely recognized methods of calculation that involve only basic arithmetic, a lay witness can rely on such methods in offering testimony.  *See* Fed. R. Evid. 701; *Neponset Landing Corp. v. Nw. Mut. Life Ins. Co.*, 902 F. Supp. 2d 166, 171 (D. Mass. 2012) ("In short, [the witness] relied on straightforward calculations and comparisons to support her opinions, which did not require the skills of an expert witness."); *United States v. Hamaker*, 455 F.3d 1316, 1331 (11th Cir. 2006) (finding that a

witness's testimony was admissible under Rule 701 where the witness "simply added and subtracted numbers from a long catalogue of . . . records, and then compared those numbers in a straightforward fashion"). However, as the reliability of a particular iPhone Application is less commonly known, it would be improper for a lay witness to offer an opinion derived using such an App without a prior determination by the Court that the App is reliable.

By analogy, it is true that some courts have allowed lay witnesses to estimate distances and identify locations that were obtained using GPS software. *See United States v. Brooks*, 715 F.3d 1069, 1077 (8th Cir. 2013) ("We cannot conclude that the district court abused its discretion in taking judicial notice of the accuracy and reliability of GPS technology" and in permitting a lay witness who had experience using GPS testify concerning the defendant's location); *United States v. Espinal-Almeida*, 699 F.3d 588, 612 (1st Cir. 2012) (explaining that issues surrounding GPS and its accuracy are not so scientific that an expert is necessary, at least where the lay witness is "knowledgeable, trained, and experienced in analyzing GPS devices"); *United States v. Thompson*, 393 F. App'x 852, 858 (3d Cir. 2010) (holding that the trial court properly allowed a lay witness to testify to the results of GPS tracking where the witness had particularized knowledge of the GPS's reliability by virtue of his experience using it).

However, the above-cited cases involved lay witnesses who had extensive experience using GPS and who were able to vouch for the GPS's reliability. Indeed, the lay witnesses in *Brooks*, *Espinal-Almeida*, and *Thompson* were all either law

enforcement officers or government contractors who repeatedly used GPS technology to track or locate suspects. *See, e.g.*, *Espinal-Almeida*, 699 F.3d at 613 ("[T]hus the testimony of Durand, someone knowledgeable, trained, and experienced in analyzing GPS devices, was sufficient to authenticate the GPS data and software generated evidence."); *Thompson*, 393 F. App'x at 858 ("[The lay witness] testified that he was trained in, experienced in, and had verified the functioning of GPS devices" and that "he does demonstrations for prospective clients by conducting live demonstrations of the reliability of the GPS devices, thus affording him a basis for attesting to the reliability of the system").

In contrast, Chris admitted in his deposition that he only recently downloaded AGRIplot and that he had limited experience using it.[26]  While Chris claimed that the iPhone Application was accurate when he tested it, Chris also testified that he does not know how accurate the iPhone App is as a general matter.[27]  These circumstances are markedly different from those of the above-cited cases, in which the reliability of the software was established by an experienced lay witness. Accordingly, while the Court will permit Chris to estimate the cleared surface area, it will not permit Chris to testify that he "verified" his measurements using the AGRIplot App.[28]

---

[26] R. Doc. No. 98-1, at 2-3.

[27] R. Doc. No. 98-1, at 1-3.

[28] The Court finds interesting the Perez entities' suggestion that Chris would be permitted to testify based on GPS technology if he had used Google Earth.  R. Doc. No. 77-2, at 13.  While the public is certainly more familiar with Google Earth than it is with AGRIplot, the Court is not certain that the reliability of that technology should be automatically assumed.  In the Court's view, whether Google Earth enjoys

Fourth, Chris's proposed testimony regarding the valuation of the "extra" work performed on the Perez property is permissible lay witness testimony under Rule 701. Contractors do not always need to be qualified as experts in order to testify regarding the value of the work they have performed. *See Nat'l Hispanic Circus, Inc. v. Rex Trucking, Inc.*, 414 F.3d 546, 551–52 (5th Cir. 2005) ("Rule 701 does not exclude testimony by corporate officers or business owners on matters that relate to their business affairs, such as industry practices and pricing."). Provided that Chris's opinions about the reasonable value of the work are based on his own past experiences and firsthand observations, they may be admitted.

The Court emphasizes, however, that Chris may not simply act as a vehicle through which the contractors introduce hearsay testimony. The Court therefore defers until trial a ruling with respect to the admissibility of each specific estimate. The Court will rule on the same upon an appropriate objection by the Perez entities at trial.

---

the same public confidence and widespread acknowledgment of reliability as, for example, the calculator or the ruler, remains to be determined.

## CONCLUSION

For the foregoing reasons,

**IT IS ORDERED** that the Perez entities' motion[29] for summary judgment that the surety provision is enforceable is **GRANTED** and the contractors' cross-motion[30] that the surety provision is unenforceable is **DENIED**.

**IT IS FURTHER ORDERED** that the Perez entities' motion[31] for summary judgment to enforce the exclusivity provision and liquidated damages provision is **GRANTED IN PART** and **DENIED IN PART** as set forth herein.

**IT IS FURTHER ORDERED** that the Perez entities' motions[32] to exclude the expert testimony of Chris Lovelace and Terry Lovelace are **GRANTED IN PART**, **DENIED IN PART**, and **DEFERRED IN PART**.  The Court rules as follows:

- Neither Chris nor Terry will be permitted to offer any opinions as experts pursuant to Rule 702;

-  Neither Chris nor Terry may opine that the soil conditions on the Perez property were consistent with the conditions reported by Mr. Coleman;

-  Chris and Terry's opinion regarding the suitability of the soil for levee construction is admissible for the limited purpose of explaining their conduct;

---

[29] R. Doc. No. 74.
[30] R. Doc. No. 71.
[31] R. Doc. No. 75.
[32] R. Doc. Nos. 76, 77.

- Chris may testify regarding the length of the levee and the surface area cleared, but he may not testify regarding his use of the AGRIplot iPhone Application;

- Chris's estimates of the cost of the additional work performed by the contractors on the Perez property are permissible Rule 701 opinions, however they must be based on his own personal knowledge and experience and must be based on admissible evidence.  The Court defers a ruling with respect to this issue until trial.


New Orleans, Louisiana, October 5, 2016.

LANCE M. AFRICK
UNITED STATES DISTRICT JUDGE